# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. CR411-200 |
| | ) | |
| MARIO LEONARDO FERRER | ) | |

## REPORT AND RECOMMENDATION

Mario Ferrer, one of the defendants in this drug conspiracy case, moves to suppress all evidence obtained as a result of a wiretap order authorizing the government to intercept communications to and from the telephone of co-conspirator Orestes Ferrer.[1] (Doc. 102.) He contends that the government failed to make the statutory showing of necessity required by 18 U.S.C. § 2518(c)(i), as it resorted to the wiretap "a scant 46 days" after learning of his existence and used the wiretap as its

---

[1] While the wiretap order did not reference Mario Ferrer as a "target subject" of the investigation, doc. 102-1 at 4, ¶ 6, he was a party to certain intercepted communications and thus enjoys the right to challenge the wiretap's legality. 18 U.S.C. § 2518(10)(a)(i).

"initial investigative tool." Doc. 102 at 2. For the reasons that follow, his motion should be denied.

## I. BACKGROUND

The Title III application in this case is based on the 56-page affidavit of Drug Enforcement Administration ("DEA") Agent Robert Livingston, dated October 12, 2010. Initially, the agent summarized the information gained during a previous year-long investigation conducted by an organized crime strike force in New York. (Doc. 102-1 at 14 ¶ 27 (Title III aff.).) Through the use of surveillance, confidential informants, pen registers, and various wiretap orders issued by both state and federal judges, the strike force had established that Gjavit Thaqi was one of the leaders of an international criminal syndicate that was engaged in the importation and distribution of large quantities of marijuana and cocaine, and in the laundering of the drug proceeds.[2] (*Id.* at 14-15 ¶ 27; *id.* at 23 ¶ 42; *id.* at 32-33 ¶ 59.) During the investigation, strike force agents amassed considerable evidence that this criminal organization, headed by Albanian nationals (*id.* at 14-15 ¶ 27), was importing over

---

[2] Thaqi was arrested and charged in July 2011. *See United States v. Lajqi*, No. CR111-486, doc. 7 (E.D.N.Y. filed June 30, 2011) (July 14, 2011 superseding indictment naming 40 defendants, including Thaqi, in a massive international drug conspiracy).

2

1,000 pounds of hydroponic marijuana each month for distribution in the New York area, had sources of supply for marijuana in both Mexico and Canada (*id.* at 15 ¶ 28), and also imported cocaine from Columbia and Venezuela into the United States, Canada, and Europe. (*Id.* at 14-15 ¶¶ 27-28.) Though the strike force had seized over $1.2 million in drug proceeds on one occasion,[3] it had been reluctant to tip its hand by making arrests or interdicting individual drug shipments given the scope of the investigation and its goal of completely dismantling a far-flung drug enterprise. (*Id.* at 16-17 ¶ 30.)

The evidence gained through the ongoing wiretaps in New York had enabled the agents to identify numerous members of the drug conspiracy and develop a clearer understanding of its methods of operation. (*Id.* at 12-14 ¶ 26; *id.* at 20-24 ¶¶ 37-43.) In early August 2010, agents intercepted a series of text messages between Thaqi and Orestes Ferrer ("Ferrer") regarding the purchase of multiple pounds of

---

[3] A confidential informant told agents that Thaqi was planning to make a large payment to his Canadian suppliers. (Doc. 102-1 at 16-17 ¶¶ 30-31.) Agents followed Thaqi and his associate, Nicholas Masi, on January 17, 2010 and observed them rendezvous with another vehicle in the Bronx, whereupon Thaqi transferred a large bag to the second car. (*Id.*) Agents followed the second car to another meeting in Manhattan, this time with a BMW bearing Canadian plates. (*Id.*) When New York police officers later stopped the BMW, they found the large bag Thaqi had transferred in the Bronx and recovered over $1,271,000 in United States currency.

3

high-grade marijuana.[4] (*Id.* at 24-30 ¶¶ 44-54.) A confidential informant of proven reliability explained that Ferrer supplied Thaqi and others with large quantities of marijuana, some of which he produced himself through indoor grow operations and some of which he acquired from other suppliers. (*Id.* at 3 ¶ 4; *id.* at 7 ¶ 13; *id.* at 20 ¶ 36.) The informant related that Ferrer operated two grow houses in Savannah, producing some 100 pounds of hydroponic marijuana every 60 days. (*Id.* at 20 ¶ 36.) He also had some 10 marijuana suppliers in Florida.[5] (*Id.*) On the wiretap, Ferrer promised Thaqi far more than his bi-monthly harvest, stating that he could deliver 100 pounds every two weeks "at the minimum." (*Id.* at 27 ¶ 48.) Not long thereafter, Thaqi visited Ferrer in Savannah and inspected his grow operation. (*Id.* at 29 ¶ 54.)

In an effort to unravel Ferrer's side of the criminal enterprise, agents obtained toll records and a pen register on his telephone. (*Id.* at 32-36 ¶¶ 59-68.) They discovered that Ferrer regularly contacted Manuel

---

[4] Intercepted conversations revealed that Ferrer offered Thaqi a menu of "designer" marijuana varieties, including Lemon Skunk, AK-47, Northern Lights, and Silver Haze ranging in price from $3500-3800 per pound. (Doc. 102-1 at 24-25 ¶ 44.) In one transaction, Thaqi committed to purchasing $105,000 worth of marijuana. (*Id.* at 32 ¶ 58.)

[5] Ferrer had recently moved from South Florida to Savannah, Georgia. (Doc. 102-1 at 19-20 ¶ 35; *id.* at 35 ¶ 65.)

Yzquierdo (179 calls or text messages between July and October 2010), Tony Palaez (273 calls), Fernando Menendez (24 calls), and Michael Maleh (202 calls or texts), Amanda Brely (4 calls, but her number also received frequent calls from Maleh), all of whom resided in South Florida and had been connected to drug trafficking via criminal database checks and details provided by informants. (*Id.*; *id.* at 51 ¶ 97.) Ferrer also made numerous calls and texts to a number subscribed to Yakelin Tamayo (2615 calls and texts), who was listed as residing in a home in Guyton, Georgia. (*Id.* at 34 ¶ 65.) Surveillance established that although the home did not appear to be occupied, it had a $480 electric bill in September 2010.[6] (*Id.*) Phone records further revealed that Ferrer was in contact with Revital Shrem (44 calls and texts), an Israeli native. (*Id.* at 35 ¶ 67.) According to a reliable informant, Ferrer's grow houses were financed in part by Israelis. (*Id.* at 35 ¶ 67.) Ferrer also contacted Savannah Hydroponics and Organics, a company that sells the special

---

[6] The affiant suggested that the residence was likely the site of one of Ferrer's marijuana grow houses. (Doc. 102-1 at 34 ¶ 65.)

5

equipment necessary for an indoor marijuana growing operation. He also called a well drilling company.[7] (*Id.* at 36 ¶ 68.)

Despite the overwhelming evidence showing that Ferrer was a major marijuana supplier for the Thaqi organization, the telephone records and intercepted phone communications suggested that Ferrer had his own network of partners, customers, suppliers, money launderers, and assistants, but the picture was hazy at best. (*Id.* at 42 ¶ 80; *id.* at 42-43 ¶ 81-82.) Of the government's two confidential informants, one lacked inside information regarding Ferrer's operations, and the other only knew one of Ferrer's associates, Michael Maleh. That informant also lived outside of the United States and thus could not further penetrate Ferrer's organization. (*Id.* at 44 ¶ 83.) Agents attempted physical surveillance but found the task to be difficult and risky since Ferrer resided in a gated community. (*Id.* at 37-38 ¶ 72.) The guards were extremely inquisitive and attempted to get agents' names and vehicle information. (*Id.*) From their limited vantage point, the agents could not view the residence to determine whether Ferrer was

---

[7] Because "hydroponic marijuana grow operations consume a large amount of water," the growers sometimes drill wells in order to keep costs down and thwart detection. (*Id.*)

6

present. (*Id.*) Even a trash pull was difficult under the circumstances. (*Id.* at 51 ¶ 96.) In any event, such tactics were unlikely to shed much new light on the organization or fill in the missing gaps in the agents' knowledge. (*Id.* at 47 ¶ 90, 51 ¶ 96.) Ferrer clearly ran his business over the telephone.

Because traditional investigative techniques were unlikely to expose the full scope of Ferrer's activities -- particularly the identity and role of all his accomplices and sources of supply and his various financial dealings -- agents approached the Court for Title III authorization. Persuaded by the government's showing, the Court first approved the wiretap of Ferrer's phone on October 12, 2010.

## II. ANALYSIS

According to defendant, "a scant 46 days" after learning of Orestes Ferrer's existence, the government resorted to the wiretap as its "initial investigative tool" in this case. (Doc. 102 at 2.) Defendant contends that because conventional investigative techniques were available to, but not employed by, the agents, the use of the wiretap was unnecessary and therefore precluded under 18 U.S.C. § 2518(1)(c).

An application for a wiretap order must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). "The necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed. . . . The affidavit need not, however, show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves." *United States v. Van Horn*, 789 F.2d 1492, 1495-96 (11th Cir. 1986). The government's showing of necessity "must be read in a 'practical and commonsense fashion,'" and the district court is entitled to "broad discretion" in making its assessment of necessity. *United States v. Alonso*, 740 F.2d 862, 868 (11th Cir. 1984). An order authorizing a wiretap "will not be overturned 'simply because defense lawyers are able to suggest post factum some investigative technique that might have been used and was not.'" *Id.* at 869 (quoting *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir. 1978)).

Defendant's contention that the government resorted to the wiretap of Ferrer's phone as "its initial investigative tool" is not supported by the record.[8] Strike force agents in New York had intercepted a series of text messages between Ferrer and Thaqi discussing the purchase and transportation of large quantities of marijuana that were either being grown by Ferrer in Savannah or could be acquired from his various Florida suppliers. (Doc. 102-1 at 24-32, ¶¶ 44-58.) The information gleaned through the New York wire intercepts was confirmed by a reliable informant, who advised the agents that Ferrer was supplying large quantities of marijuana to Thaqi, some of which Ferrer grew himself at his two Savannah grow houses and some of which he acquired from his own marijuana suppliers in Florida. Utilizing telephone toll records and pen registers, Agent Livingston confirmed that Ferrer regularly communicated with individuals who had criminal records and were suspected drug traffickers. (*Id.* at 32-36.)

---

[8] Nor is there support for defendant's claim that the government sought the wiretap "a scant 46 days" after learning of his existence. While *Agent Livingston* may not have learned of Ferrer's existence until August 27, 2010, (doc. 102-1 at 4 ¶ 4), the New York strike force agents (who had been investigating Thaqi's criminal organization for more than a year) had flagged Ferrer as a person of interest weeks prior to Livingston's involvement in the investigation. Because strike force agents first intercepted phone calls between Ferrer and Thaqi on August 3, 2010, (doc. 102-1 at 19 ¶ 35), the investigation of Ferrer's activities had been ongoing for 70 days, not a "scant 46" as Ferrer contends.

9

Agents had attempted surveillance of Ferrer's activities but were frustrated in their efforts by the inquisitive guards who protected his gated community. (*Id.* at 37-38.) Thus, the claim that the agents used the wiretap of Ferrer's phone as their initial investigative technique is plainly incorrect.[9]

---

[9] Defendant also suggests that the affidavit seeks to "shoe-horn" an earlier necessity finding against Thaqi into the Ferrer wiretap affidavit, which amounts to an impermissible attempt to transfer a statutory showing of necessity from one Title III application to another. (Doc. 102 at 15.) In support of this assertion, defendant cites to *United States v. Gonzalez, Inc.*, 412 F.3d 1102 (9th Cir. 2005). In that case, agents painstakingly gathered evidence linking a public bus company to an alien smuggling operation. *Id.* at 1106-07. After building a very solid case, they conducted a brief investigation into the company's home office before requesting a wiretap to intercept incriminating evidence linking its top brass to the smuggling ring. *Id.* at 1107. Prior to the headquarters wiretap, the agents had employed five days of pen registers and trap-and-trace analysis, limited physical surveillance, and a preliminary attempt to place an undercover agent. *Id.* The wiretap was approved, but the district judge excluded any evidence derived from it, since the affidavit failed to show that traditional investigative procedures had been tried and failed, were unlikely to succeed if attempted, or were too dangerous to attempt. *Id.* at 1110. The Ninth Circuit affirmed.

While there are parallels to this case, *Gonzalez, Inc.*, is easily distinguishable. Most fundamentally, the agents in that case were looking for primary evidence linking certain high-level employees to the criminal activities of their bus line. Rather than attempting basic investigatory tactics that had succeeded earlier in the case, the agents almost immediately obtained a wiretap. Here, however, investigating agents already had Orestes Ferrer dead to rights. The Thaqi wiretap, along with information from confidential informants and Ferrer's own telephone logs, supplied ample probable cause to arrest and indict Ferrer and to obtain search warrants for his Savannah residences. (Doc. 102-1 at 5 ¶ 8.) The "necessity" here was targeted at uncovering the rest of the conspiracy. Additionally, Agent Livingston noted that there were dangers at play here that were absent in *Gonzalez, Inc.* There, the affiant failed to offer any statements supporting a finding that law enforcement had reason to fear danger with anyone associated with the office under investigation.

10

The question remains, however, whether the wiretap was necessary. The burden of establishing necessity is "not great." *United States v. Acosta*, ___ F. Supp. 2d ___, 2011 WL 2401829 at *68 (N.D. Ga. June 13, 2011) (quoting and citing *United States v. Gray*, 410 F.3d 338, 343 (7th Cir. 2005)). "The statute was not intended 'to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques.'" *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1214 (11th Cir. 2010) (quoting *Alonso*, 740 F.2d at 868). Hence, "a comprehensive exhaustion of all possible investigative techniques is not necessary before applying for a wiretap." *Id.* at 1214 (citing *Alonso*, 740 F.2d at 868); *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir. 1978) (same).[10] In making the determination, courts should evaluate wiretap affidavits "in a 'common sense fashion,' and 'the determination of when the Government has satisfied [the statutory] requirement must be made against flexible standards, and . . . each case must be examined on its

---

[10] *Hyde* is binding Eleventh Circuit authority. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981).

own facts.'" *United States v. Miller*, 431 F. App'x 847, 853 (11th Cir. 2011) (quoting *Hyde*, 574 F.2d at 867).

Agents investigating Ferrer had gathered considerable information against him before applying for a wiretap on his personal phone. Agent Livingston concluded, however, that further use of conventional investigative techniques would be unlikely to achieve the goal of unraveling the full scope of Ferrer's own activities, much less of identifying all of his associates and developing sufficient evidence to secure *their* convictions. He discussed his concerns at length, explaining that physical surveillance and trash pulls were limited based upon Ferrer's relative seclusion in a gated community.[11] (Doc. 102-1 at 37 ¶

---

[11] Defendant insists that the agents should have conducted surveillance at Orestes' "primary" Florida address. (Doc. 102 at 5.) The affidavit makes clear, however, that Ferrer was "currently residing" in Savannah rather than in Florida, where he had "previously" lived. (Doc. 102-1 at 19-20 ¶ 35.) He also insists that there is ambiguity over whether the agents employed trash pulls. (Doc. 102 at 5.) The affidavit suggests that trash pulls were used during the investigation (doc. 102-1 at 41 ¶ 78), but *were not* used at Ferrer's residence in the gated Savannah neighborhood. (*Id.* at 51 ¶ 96.)

In a related vein, defendant insists that these "ambiguities" provide grounds for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1956). (Doc. 102 at 15-16.) Under *Franks*, a defendant is entitled to peer behind an affidavit in support of a wiretap order where a he makes a substantial preliminary showing that the affiant knowingly and intentionally, or with a reckless disregard for the truth, included misleading information that was material to the finding of necessity. *United States v. Wilson*, 314 F. App'x 239, 243-44 (11th Cir. 2009); *see United States v. Novaton*, 274 F.3d 968, 896 (11th Cir. 2001) (applying *Franks* to a wiretap affidavit where

72.) Further physical surveillance and additional trash pulls offered little promise of uncovering the full scope of the conspiracy even under ideal circumstances. In Agent Livingston's experience, drug dealers generally attempt to prevent their associates from meeting other suppliers or customers for fear of being cut out of future transactions and to prevent penetration by government agents. (Doc. 102-1 at 44-45 ¶¶ 85-86.) The circumstances here were not ideal, however. The conspirators had already exhibited cautious behavior designed to thwart surveillance, including swapping prepaid phones on a regular basis and performing counter-surveillance.[12] They had also been alerted to police activities. (*Id.* at 45-47 ¶¶ 87-88.) One of Thaqi's associates, Masi, had discovered a GPS unit on his vehicle. (*Id.* at 43-44 ¶ 83.) While the

---

statements were allegedly material to the finding of probable cause); *United States v. Kelley*, 2009 WL 2589086 at *2-3 (S.D. Ala. Aug. 17, 2009); *United States v. Ortega-Estrada*, 2008 WL 4716949 at *15-16 (N.D. Ga. Oct. 22, 2008); *United States v. Olmedo*, 552 F. Supp. 2d 1347, 1369-70 (S.D. Fla. Apr. 28, 2008); *United States v. Flores*, 2007 WL 2904109 at *6-7, 31-36 (R&R portion of the order) (N.D. Ga. Sept. 27, 2007). Reading the affidavit as a whole, any ambiguities were simply not material to the necessity finding. And defendant hasn't come forward with any extra-affidavit evidence suggesting that Livingston made material misrepresentations. He has not come close to showing the requisite level of scienter, so his request for a *Franks* hearing was properly denied.

[12] Thaqi advised Ferrer that he regularly changed his "work" number. (Doc. 102-1 at 28 ¶ 51.)

investigators had developed two confidential informants who furnished helpful information about Ferrer's role in the drug enterprise, (doc. 102-1 at 19-20 ¶ 36, 44 ¶ 83), those informants had only limited knowledge of Ferrer's activities and were not in a position to develop contacts with his other customers or suppliers. (*Id.* at 44-45 ¶¶ 83-86.) Nor was Agent Livingston aware of any other informant with such knowledge, and he did not think it feasible that an undercover agent might safely infiltrate Ferrer's organization. (*Id.* at 45-46 ¶ 88.) Additionally, resort to search warrants or a grand jury investigation was premature, since those tactics would give away the ongoing investigation. (*Id.* at 48-50 ¶¶ 92-93); *see Sills v. United States*, 395 F. App'x 570, 572-73 (11th Cir. 2010) (defendant's contention that the Title III affidavit showed impatience rather than an earnest attempt to investigate rejected; affidavit was sufficient since it summarized a wide range of techniques attempted or considered, explained that the informants available had little knowledge of the inner workings of the conspiracy, noted that the members were a close knit group unlikely to trust undercover agents, and explained that warrants and subpoenas would alert the conspirators to the investigation).

Defendant insists that the investigating agents could have done more. That is almost always true. Given adequate time and funding, state and federal agencies could have assembled sufficient man power to tail Ferrer and every person identified through his telephone records morning, noon, and night, and well-executed drug stops might have netted additional informants without tipping off the other conspirators. But even if the investigators went to such extreme lengths, they would have been unlikely to uncover the full scope of *this* conspiracy, which conducted much of its business by telephone and reached across state and even national lines.

Defendant is reminded that the government sets the scope of the investigation. Where it hopes to cast a wide net, agents may turn to a wiretap to learn the full scope of a conspiracy, even where conventional techniques would allow for the prosecution of specific conspirators. *See Miller*, 431 F. App'x at 843-54 (in a broad drug conspiracy, even if certain information could have been uncovered through the use of traditional methods, a wiretap would still be necessary to fully flesh out the criminal enterprise); *United States v. Olmedo*, 552 F. Supp. 2d 1347, 1365 (S.D. Fla. 2008) ("where conventional techniques will not show the entire

scope of the conspiracy, a wiretap is permissible, even in those situations where conventional techniques will allow for the arrest and conviction of some members").[13] In any event, such extreme efforts to avoid use of a wiretap were not required. *Alonso*, 740 F.2d at 868. "Necessity" should not be read in such an "overly restrictive manner." *Acosta*, 2011 WL 2401829 at *69 (quoting *United States v. Wilson*, 484 F.3d 267, 281 (4th Cir. 2007)).

The Court is satisfied that the affidavit showed the requisite necessity, since the investigators could not have uncovered the full breadth of the conspiracy in a relatively safe manner without using a wiretap. *United States v. Degaule*, 797 F. Supp. 2d 1332, 1357-61 (N.D. Ga. 2011). Consequently, the issuing judge's necessity determination was valid and defendant's motion fails.

---

[13] Courts across the nation have repeatedly held that agents may use a wiretap to uncover the full scope of a drug conspiracy where other methods could compromise the investigation or place agents in danger. *United States v. Johnson*, 393 F. App'x 240, 241-42 (5th Cir. 2010); *United States v. Armenta*, 373 F. App'x 685, 688-89 (9th Cir. 2010); *United States v. Wilson*, 314 F. App'x 239, 243 (11th Cir. 2009); *United States v. Carter*, 449 F.3d 1287, 1293 (D.C. Cir. 2006); *United States v. Jackson*, 345 F.3d 638, 644-45 (8th Cir. 2003) (same); *see also United States v. Perez*, 661 F.3d 568, 582 (11th Cir. 2011) (in robbery conspiracy case, the fact that the government could gather enough evidence to prosecute a defendant did not undermine the wiretap's necessity; the government still had a limited knowledge of the full extent of his activities and coconspirators).

## III. CONCLUSION

For all of the reasons explained above, the motions to suppress (doc. 102) should be **DENIED**.

**SO REPORTED AND RECOMMENDED** this 2nd day of February, 2012.

*/s/ G. R. Smith*
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA